ZACHARY LINOWITZ, ESQ. (State Bar No. 287368)
LINOWITZ LAW
1300 Clay Street, Suite 600
Oakland, CA 94612
Phone: 510-519-1401
zachary@linowitzlaw.com
*Attorney for Plaintiff K.F.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

K.F., a minor, by and through her proposed guardian ad litem, MELISSA CHATTERTON,

Plaintiff,

v.

COUNTY OF CONTRA COSTA; GLORIA CALDERON; JOE LEWIS, JR.; MATTHEW WILLIAMS; AMASIA WILBORN; JAYME SLAY; JACOB DUDZIAK; BAYSHTA AGUILA; DEIZIANA DARGAN; ROSA LEON; and DOES 1–10,

Defendants.

Case No. 4:26-cv-13326

**COMPLAINT FOR DAMAGES**

1. Excessive Force (42 U.S.C. § 1983)
2. Failure to Intervene (42 U.S.C. § 1983)
3. Municipal Liability (42 U.S.C. § 1983)
4. Americans with Disabilities Act (42 U.S.C. § 12132)
5. Rehabilitation Act (29 U.S.C. § 794)
6. Bane Act (Cal. Civ. Code § 52.1)
7. Battery
8. Negligence

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1. On October 3, 2025, County of Contra Costa juvenile hall staff broke sixteen-year-old K.F.'s left arm during a search and restraint encounter at John A. Davis Juvenile Hall in Martinez. Three days earlier, the County had placed the girl on suicide watch. She had been refusing meals since her arrival eight days before, and staff had noted that she looked malnourished. That morning, staff told her she would be patted down before returning to her room. K.F. repeatedly explained that being touched caused distress because of prior trauma—she had "been touched [her] whole life," a history of sexual abuse the Probation Department already knew—and asked for the



LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

one supervisor she wanted to talk to. She took off her shoes and socks so staff could check them. Every other youth on the unit had been secured.

2. Staff called an emergency code over a nonurgent pat-down and surrounded K.F. with approximately twelve officers. When she stood and stepped toward the supervisor, six or seven officers took her to the floor and pinned her face down, and as two of them forced her left arm from above her head to behind her back, it popped. They handcuffed the injured arm behind her. After one officer warned staff about the pop and K.F. rated her pain 10 out of 10, they stood her up, walked her to her room, and pat-searched her before removing the cuffs. The fracture required surgery to implant two plates and a series of screws in her arm.

3. K.F. challenges the decision to answer a nonurgent search with force, the degree and manner of that force, and the continued restraint after signs of injury, as well as the County's failure to reasonably modify its search practices for her known disabilities. The Ombudsperson Division of the California Office of Youth and Community Restoration (OYCR) investigated and substantiated excessive or disproportionate force, identifying unnecessary escalation, failure to consider trauma and physical vulnerability, and an internal County review that did not examine the full encounter. K.F. seeks damages for her fracture, resulting treatment and limitations, and the physical and psychological harm caused or aggravated by Defendants' conduct.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over K.F.'s federal claims under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4), and supplemental jurisdiction over her state-law claims under 28 U.S.C. § 1367(a).

5. Venue is proper under 28 U.S.C. § 1391(b)(2) because all events and omissions giving rise to these claims occurred in Martinez, Contra Costa County, within this District.

6. This action arises in Contra Costa County and is appropriate for assignment to the San Francisco or Oakland Division under Civil Local Rules 3-2(c)–(d).

## GOVERNMENT CLAIM

7. On July 16, 2026, K.F. submitted an application for leave to present a late government claim, with her proposed claim attached, concerning the October 3, 2025 incident. The

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

County Board of Supervisors granted that application on August 25, 2026. Under California Government Code section 912.2, the attached claim was deemed presented on that date.

8. The County did not act on the claim within 45 days after August 25, 2026, and the period for action was not extended by agreement. The claim was therefore deemed rejected by operation of law on October 9, 2026, under Government Code section 912.4(c). No written notice of rejection has been delivered or mailed to K.F. or her counsel. The applicable claim-presentation requirements for the state claims have been satisfied.

9. The claim described the incident, employees, physical and psychological injuries, and the state-law theories arising from the search, escalation, force, restraint, and related omissions. K.F.'s federal causes of action are not subject to California government claim-presentation requirements.

**PARTIES**

10. Plaintiff K.F. was sixteen years old and detained at the County's John A. Davis Juvenile Hall on October 3, 2025. She is no longer in custody. She remains a minor and sues through her proposed guardian ad litem, Melissa Chatterton, whose appointment is requested under Federal Rule of Civil Procedure 17(c). She proceeds by her initials under Federal Rule of Civil Procedure 5.2(a)(3).

11. Defendant COUNTY OF CONTRA COSTA (the County) is a California public entity. Through its Probation Department, it operated, managed, and staffed John A. Davis Juvenile Hall and was responsible for the policies, practices, training, and supervision governing searches, emergency responses, force, and restraints.

12. Defendant GLORIA CALDERON was a County Institutional Supervisor I at the juvenile hall. Defendant MATTHEW WILLIAMS was a County Deputy Probation Officer there. Defendants JOE LEWIS, JR., AMASIA WILBORN, JAYME SLAY, JACOB DUDZIAK, BAYSHTA AGUILA, DEIZIANA DARGAN, and ROSA LEON were Juvenile Institution Officers (JIOs) there. Williams, Lewis, Wilborn, Slay, Dudziak, Aguila, Dargan, and Leon are referred to as the "Force Defendants."

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

13. Each individual defendant had custodial responsibilities in a juvenile detention facility operated by the County's Probation Department and was a peace officer under Penal Code section 830.5(b), and therefore within the meaning of Civil Code section 52.1(n). Each acted under color of state law and within the scope of County employment and is sued in an individual capacity.

14. DOES 1–10 are County employees whose names are unknown to K.F. Does 1–5 used or materially assisted the force alleged here. Does 6–10 knew of the force alleged here, had a realistic opportunity to stop it, and failed to act. Each is sued in an individual capacity. K.F. will amend this complaint when their identities are known.

## FACTUAL ALLEGATIONS

**The County knew K.F. was medically and psychologically fragile.**

15. K.F. was booked into the juvenile hall on September 25, 2025. From her arrival she refused meals, and medical staff supplied protein shakes in their place. Staff recorded that she appeared malnourished and had lost a noticeable amount of weight. On October 3, she weighed 110 pounds—about 15 pounds less than in March 2025.

16. The County's own clinicians had diagnosed K.F. with post-traumatic stress disorder, major depressive disorder, and an eating disorder, and had documented her prior suicide attempts and psychiatric hospitalizations. A County behavioral-health safety plan prepared in March 2025 identified "not eating" as a warning sign of her suicidal crises. In August 2025, a County physician flagged her lab results as concerning for malnutrition, noting a 24-pound weight loss over the prior year and a half.

17. The Probation Department also knew K.F. had been sexually abused. In March 2025, her probation officer confirmed to County clinicians that K.F.'s history of sexual abuse was already known to Probation.

18. On September 30, after K.F. expressed suicidal ideation, the County placed her on Constant Observation, or CO-3, under direct supervision around the clock. On October 2, Behavioral Health stepped her down to Close Observation, or CO-2, after observing improvements in her commitment to safety. That status called for a pat search each time she returned to her room, a measure Calderon described as "precautionary."

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

19. On October 3, K.F. told Wilborn, and after the code was called told Calderon in front of the responding officers, that she had "been touched [her] whole life." Calderon and Lewis also knew of the recent suicide precautions and eating concerns; both described them in their incident reports.

20. K.F.'s PTSD, depressive disorder, and eating disorder substantially limited major life activities, when active, including caring for herself, eating, sleeping, and interacting with others. Her history included suicidal crises requiring protective intervention, withdrawal, disturbed sleep, and food restriction despite weight loss. She also had a record of those impairments. Her recent observation status and repeated explanation that touching caused acute distress reflected continuing disability-related needs.

21. The County's Use of Force Policy (Policy 514) requires staff to "evaluate prior trauma and the behavioral health of the youth, and exercise reasonable judgment, when restraining any youth who has a physical or medical condition" that restraint could affect. Its procedures also call for efforts to obtain cooperation and a graduated code response. Those provisions addressed the very risks presented by K.F.'s known condition.

**K.F. refused to be touched and asked for a supervisor.**

22. At about 9:55 a.m. on October 3, while in class on the Shasta Unit, K.F. asked JIO Wilborn to let her speak with Institutional Supervisor Calderon. Wilborn told K.F. she would notify Calderon and asked Aguila to telephone her. At approximately 10:05 a.m., as K.F. returned from school to her room, Wilborn directed her to sit at a table in the unit's common area and submit to a pat search. K.F. objected to being touched and again asked to speak with Calderon.

23. K.F. sat at the table as directed. One officer sat with her and two other officers stood nearby. Wilborn and Aguila described using the County's Core Correctional Practices approach of effective disapproval to obtain compliance. They told K.F. that her refusal was "unacceptable," encouraged her to consider why refusing was "undesirable behavior," and warned that it would result in a code, a failure to earn points, and Loss of All Privileges.

24. K.F. repeatedly told staff that she did not want to be touched, explained that she had been touched throughout her life, and again asked to speak with Calderon. She was communicating trauma-related distress.

25. At an officer's request, K.F. removed her socks and shoes. That part of the search did not require an officer to touch her. She remained unwilling to submit to a pat-down but continued to explain her objection. K.F. cooperated with every part of the search that did not require touching her.

26. All other youth in the area were secured. K.F. was not attempting to leave the facility. There was time to continue communication and consider a safe accommodation before conducting the search or returning her to her room.

**Calderon directed an emergency code, and a dozen officers responded.**

27. Lewis, who had heard K.F. insist that she would speak only to Calderon, called Calderon to report the refusal. Calderon did not come to speak with K.F. She advised Lewis that "refusal of staff directives should result in an emergency code being activated." At approximately 10:08 a.m., Lewis called a Code 2. Approximately nine additional staff members, including Calderon, responded, bringing the total number present to approximately twelve. No behavioral-health staff responded with that group.

28. The County's incident materials described the increased staff presence as a "show of force." Approximately twelve officers surrounded K.F. while she was expressing distress about being touched.

29. While seated, K.F. asked Calderon why she had to be pat-searched and again said that staff did not understand that she had been touched throughout her life. Her request for help and her explanation of her needs continued after Calderon arrived. Calderon's response, as other officers described it, was to reiterate that K.F. had to be pat-searched.

30. Available alternatives included reducing the number of officers directly engaging her, using a single calm lead communicator, allowing a calm conversation with Calderon or another trusted adult, involving behavioral-health staff, maintaining physical space, and allowing additional time before a nonurgent search. Those measures could have preserved safety while addressing her

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

distress and assessing what search procedures she could tolerate. OYCR identified the same measures.

31. The County's use-of-force policy provides that "[a]fter it has become apparent to staff that a youth will not cooperate with staff directives, and all reasonable efforts have been made by staff to gain the cooperation of the youth, the Juvenile Institution Officers (JIO) involved in negotiating with the youth will initiate a Code 1 response." A Code 2 may be called after ten minutes of counseling from support staff.

32. Lewis called a Code 2 over the radio at 10:08 a.m., approximately three minutes after K.F. sat down. No Code 1 was called; staff proceeded directly to Code 2 while K.F. was still discussing the search. Aguila wrote that the code came "[a]fter exhausting all efforts." By the officers' own accounts, those efforts were directives, warnings of consequences, and "effective disapproval."

**Officers took K.F. to the floor and broke her arm.**

33. After sitting at the table for more than a minute while surrounded by a dozen officers, K.F. stood up and moved toward Calderon with her arms at her sides. She did not strike anyone. Officers' reports later described the movement as a "lunge" and K.F. as "launching herself." OYCR, having reviewed the video, found those characterizations "not clear from the video," which shows K.F. "stand up suddenly and advance toward ISI Calderon."

34. As K.F. stood, a "Code 3" was called. At least six officers—Wilborn, Lewis, Williams, Dudziak, Dargan, and Aguila—converged on K.F., pulled her back, took her to the floor, and rolled her onto her stomach. Wilborn swept K.F.'s left leg with a rear leg sweep while Lewis pulled her down by the back of her shirt. Aguila grabbed her right arm as she went down and then held her left ankle. Dargan held her right leg. Staff physically controlled her while bringing her arms behind her back for handcuffing.

35. K.F. lay face down. Williams, who had positioned himself at her head, had taken hold of her left wrist, which was above her head. Officers ordered her to put that hand behind her back while Williams held it; by their accounts, she yelled and did not comply. No officer reported that she struck or kicked anyone or tried to get up. Lewis secured K.F.'s left arm and wrist and

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

applied a rear elongated wrist lock to bring her left arm behind her back. Williams, still holding that wrist, helped force it from above her head to behind her back. Both heard a pop during that maneuver. Dudziak controlled K.F.'s right arm with a rear elongated wrist lock; Wilborn also used a right-arm wrist lock before applying the cuffs.

36. The officers controlling K.F.'s body and limbs held her while Lewis and Williams manipulated her left arm behind her back. Their application of force to that arm was excessive in the context of the physical control already imposed and the circumstances confronting them. Lewis applied that force knowing, as his own report states, that K.F. "appears to be malnourished." Lewis and Williams's arm manipulation caused K.F.'s fracture.

37. The takedown was itself disproportionate. Staff had many opportunities to avoid any use of force, and with about a dozen officers present, any need to keep a 110-pound girl from reaching Calderon could have been met by stepping between them. OYCR concluded on that basis that "any use of force was disproportionate to the situation and excessive." Even if some force was justified when K.F. moved toward Calderon, that need diminished once multiple officers controlled her face down on the floor. The force applied to her left arm after that point exceeded the need to restrain her. The degree and manner of force were unreasonable in light of her age and size, her communicated distress, the vulnerabilities known to the responsible officers, and the control already imposed.

**Staff continued restraint after signs of injury.**

38. No one stopped to assess K.F.'s arm. Wilborn secured K.F.'s wrists behind her back with handcuffs supplied by JIO Jayla Adams. Slay then took over K.F.'s left arm from Lewis—the arm that had just popped—and held it in a rear wrist lock while she lay face down. Neither Lewis nor Williams, both of whom had heard the pop, stopped the handcuffing or the wrist lock.

39. Only after K.F. was handcuffed did Williams alert staff on the unit to the popping sound; medical staff were then notified. Slay and Dargan moved K.F. from face down to seated. Dargan took hold of her injured left arm, and Leon her right. Dargan had already released K.F.'s leg because, in Dargan's words, K.F. was "calm and cooperative." Seated, K.F. said her left arm hurt

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

and, asked by Dargan to rate the pain, reported it was a 10 out of 10. Dargan told her the nurse would be notified. Dargan and Leon thus knew of severe pain before the escort and search began.

40. No one removed the handcuffs. Dargan and Leon lifted K.F. to her feet and walked her, still handcuffed behind her back, to her room. On the way, she complained of pain in her left arm and, as Leon put it, “had difficulty walking on her own.” Slay, who helped guide her, heard her complain of pain in her left arm. Before she entered her room, at Calderon’s direction, Dargan pat-searched her left side and Leon her right. No contraband was found. Calderon was on the unit when Williams alerted staff to the pop and accompanied the escort until Adams relieved her. On information and belief, she heard Williams’s warning and K.F.’s complaints of pain before she directed the search.

41. Adams, who walked with them, reported that K.F. complained of left-elbow pain during the escort; Adams told her the nurse could check her “once I remove the handcuffs.” K.F. cried as the left cuff was removed at approximately 10:14 a.m., telling Adams her elbow was hot and hurting.

42. Calderon directed that the cuffed restraint and search continue despite the warning about the pop and K.F.’s pain complaints. Dargan and Leon personally heard the report of severe pain and continued the escort and search. Slay heard K.F.’s complaints and continued guiding her to the room. K.F. was then under staff control, and staff had an opportunity to pause, reassess the restraint, and obtain an assessment before completing the pat-down.

43. Continuing to restrain and move K.F. for a nonurgent search after those signs of injury was unreasonable in its manner and duration. The arm manipulation caused the fracture, and the continued restraint after the warning and severe-pain report caused additional pain, distress, and psychological harm.

**The fracture required surgery and rehabilitation.**

44. Nursing staff assessed K.F., and she was taken by wheelchair to the nurse’s station. The County’s incident report records that she was not seen by mental health staff, although she remained on suicide precautions.

45. At 11:04 a.m., the emergency department recorded a referral call from a juvenile hall nurse reporting that K.F.'s elbow had been twisted while staff held her and that a pop was heard, followed by significant pain. The emergency physician separately recorded staff's account that her left arm was twisted during restraint, causing an audible pop and subsequent pain. At about 11:20 a.m., more than an hour after her arm popped, staff drove her to the county hospital. The hospital recorded arrival at 11:38 a.m.

46. X-rays and a CT scan taken on October 3 confirmed that K.F.'s left arm was broken just above the elbow—a displaced supracondylar fracture of the distal humerus—with an associated joint effusion. Moving her elbow caused significant pain. Medical staff immobilized her arm in a long-arm splint and sling and referred her for urgent orthopedic care. On October 8, orthopedic surgeon Dr. Edward Tang confirmed the displaced supracondylar/transcondylar fracture and recommended surgery to realign and stabilize the broken bone.

47. On October 16, 2025, K.F. underwent open reduction and internal fixation under general anesthesia and a nerve block. Dr. Tang made a posterior incision and secured the fracture with two metal plates and multiple screws. Recovery required immobilization, pain treatment, restrictions on lifting and bearing weight through the arm, and occupational therapy.

48. K.F. struggled with pain, swelling, weakness, and severe restrictions in elbow movement after surgery. At her November 6 occupational-therapy evaluation, her left grip strength measured only 17 pounds, compared with 38 pounds on the right. She could bend her elbow to 95 degrees but fell 70 degrees short of straightening it fully. Substantial stiffness persisted through December. On December 30, she could bend the elbow only 93 degrees and still lacked 47 degrees of full extension, requiring continued therapy. In the months after surgery, pain disrupted her sleep.

49. K.F.'s recovery extended well into 2026. By January 14, the fracture had healed with mild deformity at the fracture site, and the surgical hardware remained in her arm. She still could not bend or straighten her elbow normally. Dr. Tang documented "significant elbow stiffness," with flexion limited to 90 degrees and a 40-degree deficit in extension. He recommended aggressive, continued rehabilitation and approved dynamic splinting to help her regain motion. Even his "end functional goal" for her—a range of 30 degrees of extension and 130 degrees of flexion—fell well

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

short of the motion in her uninjured right arm. Her occupational-therapy plan set goals for her to regain the ability to wash her back, pull on her socks and clothes, pull on a seatbelt, and carry a school backpack using her left arm.

50. Five months after Defendants broke her arm, K.F. continued to suffer weakness and restricted movement that interfered with ordinary activities. At her March 5, 2026 physical-therapy evaluation, she could bend her left elbow only 105 degrees, compared with 150 degrees on the right, and lacked 31 degrees of full extension. Treatment that day produced only partial improvement: flexion reached 110 degrees, and she still could not straighten the arm within 26 degrees of full extension. Testing confirmed reduced left elbow strength, and the therapist documented limitations in reaching and carrying. She habitually held her left arm close to her body, rotated inward with the elbow bent, and the therapist classified her elbow stiffness as chronic and not changing. Her treatment plan called for ten weekly physical-therapy visits and daily home exercises to improve motion, strength, and her ability to perform everyday tasks. She has not regained normal motion or strength in her left arm.

51. K.F. was left with a surgical scar and months of treatment and rehabilitation. Her treatment has generated substantial medical expenses, and she will incur further expenses for care made necessary by her injuries. She suffered physical pain, fear, humiliation, emotional distress, and loss of enjoyment of life. Being surrounded, held down, and forcibly handled after repeatedly explaining that touching triggered her prior trauma retraumatized her and aggravated her preexisting trauma-related and depressive conditions.

**The internal review and independent investigation.**

52. K.F. submitted a grievance explaining that the search and force traumatized her, that staff failed to pay attention to her safety, and that she did not feel heard. She requested the identity of the employee who broke her arm.

53. The County's Use of Force Committee reviewed the incident and approved the force based on K.F.'s quick advance toward Calderon. The review did not adequately address the preceding search interaction, the decision to call a Code 2, the need for individualized precautions, or the opportunities to avoid or reduce force. The officers' personnel reports bear submission dates

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

of October 29, 2025, nearly four weeks after the incident, and the County's incident report records that no statement was taken from K.F. Although County policy calls for a debriefing with "staff and/or youth for the purposes of training as well as mitigating the effects of trauma," no debriefing was documented.

54. The Committee recommended that a white shirt "should have been considered" to make K.F.'s "medical status" more visible to staff. The County has since told OYCR that youth with similar medical concerns now wear a white shirt "to indicate that no mechanical restraints can be used by staff during emergency intervention." The County's own reviewers thus recognized that K.F.'s condition called for precautions against the very restraint used on her.

55. OYCR investigated the incident and issued findings on June 24, 2026. After reviewing the video, the incident reports, and the County's use-of-force, restraint, emergency-code, and suicide-prevention policies and procedures, it substantiated the allegation that staff used excessive force on K.F. OYCR found that the Code 2 was called before staff had exhausted reasonable efforts and without a preceding Code 1, that no code appeared necessary at all, and that the force could and should have been prevented.

56. OYCR identified the lack of urgency, K.F.'s communication of trauma-related fear and partial cooperation, the unnecessary show of force, and the internal review's failure to examine the full interaction. It found that K.F.'s ability to identify the source of her distress showed "a level of insight that should have been explored and engaged rather than met with force," and that the County's response left "a suicidal, medically fragile teenage girl who was expressing concerns related to a past sexual trauma … surrounded by 12 law enforcement staff."

57. The County disputed the finding in a July 22, 2026 response. On September 21, 2026, the Ombudsperson reaffirmed it, concluding that because staff had many opportunities to avoid force altogether, any use of force was disproportionate and excessive, and referred its findings to the Board of State and Community Corrections.

**County practices caused K.F.'s injury.**

58. K.F.'s injury was the product of County practices, not a single officer's lapse:

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

(a) The County treated a youth's refusal of a directive as misconduct to be met with an emergency code and sanctions. Its Behavioral Management System classifies "high-level noncompliance" as Level 3 Misconduct; the supervisor on duty here instructed that "refusal of staff directives should result in an emergency code being activated"; and officers followed that instruction rather than the policy's progression and its requirement that reasonable efforts be exhausted first.

(b) The County had no protocol for adapting the search of a youth who discloses that being touched causes trauma-related distress (by allowing time, involving a trusted adult or behavioral-health staff, or using less intrusive means) before resorting to force, and no procedure prompting staff to involve behavioral-health staff before calling a code on a youth known to have a trauma history. Only after K.F. was injured did the County begin asking behavioral-health staff to respond to interventions involving youth with known trauma histories, and begin working with them on a trauma-informed approach to searching youth who have experienced sexual trauma.

(c) The County had no effective practice for identifying a medically fragile youth to the staff who might restrain her, or for limiting the restraints used on such a youth. Its own use-of-force reviewers concluded that a designation flagging K.F.'s medical status should have been considered, but none was used. Only afterward did the County begin requiring youth with similar medical concerns to wear a white shirt indicating "that no mechanical restraints can be used by staff during emergency intervention."

(d) When K.F. was injured, the County's formal use-of-force review process applied only to incidents involving OC spray, so hands-on force against youth received no comparable systematic review. The County did not extend that process to all uses of force until August 2026. Although the Use of Force Committee did review the force used on K.F., it approved that force on the

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

sole ground that the "youth quickly advanced toward ISI Calderon," without examining the decision to call the code or whether staff had exhausted reasonable alternatives.

(e) The County trained its officers to answer a youth's refusal with Core Correctional Practices techniques ("effective disapproval" and "effective use of authority"), which consist of scripted disapproval and warnings of consequences, followed by an emergency code. The officers' own reports describe staff using those techniques on K.F. On information and belief, whatever general instruction in de-escalation or trauma-informed care the County provided, it did not teach officers to distinguish a trauma-based refusal of touch from defiance, or how to adapt a search when a youth discloses one.

59. The County knew that many girls in juvenile detention have histories of sexual abuse, that forcible touching and restraint retraumatize them, and that malnourished youth are vulnerable to injury in restraints. Its own policies—requiring staff to evaluate a youth's trauma history and behavioral health when restraining a youth whose condition restraint could affect—show that it recognized those risks. Youth with those histories come into the juvenile hall routinely, and refusals of searches and other directives are a recurring feature of juvenile detention, so the County's policymakers knew officers would regularly confront a trauma-based refusal of touch. The need for the protocols and training described above was so obvious, and the likelihood that their absence would lead to unconstitutional force so predictable, that the County's failure to adopt them was deliberately indifferent.

60. The County's policies and implementation decisions alleged above were adopted or maintained by County officials with final policymaking authority over the relevant juvenile hall operations. Those officials include the County's Chief Probation Officer, under whose management and control the juvenile hall operates. Welf. & Inst. Code § 852.

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

**FIRST CLAIM FOR RELIEF**

**Excessive Force — Fourteenth Amendment (42 U.S.C. § 1983)**

**(Against Calderon, the Force Defendants, and Does 1–5)**

61. K.F. incorporates the Factual Allegations above.

62. As a youth detained in County custody, K.F. had a right under the Due Process Clause of the Fourteenth Amendment to be free from force that was objectively unreasonable or not rationally related to a legitimate, nonpunitive purpose.

63. The force used on K.F. was objectively unreasonable. There was no need to complete a hands-on search by force at that moment: she was seated, every other youth was secured, and she had complied with every part of the search that did not require touching her. Calderon and Lewis knew she was malnourished and on suicide precautions; every officer present heard her refuse to be touched, and after Calderon arrived she told them she had been touched her whole life. They answered her refusal with an emergency code and approximately a dozen officers. Whatever need for force arose when K.F. stood, it diminished sharply once six or seven officers had her face down on the floor. The force that broke her arm came after that point, applied to a malnourished girl who was pinned and outnumbered. After the pop, and after she rated her pain a 10, officers kept her handcuffed behind her back, stood her up, walked her to her room, and finished the search before removing the cuffs.

64. Defendants' acts were deliberate. The takedown, the wrist locks, the handcuffing, and the continued restraint and search after the injury were purposeful uses of force. The continued restraint and search after the injury independently caused K.F. additional pain and distress, whether or not it worsened the fracture.

65. Each defendant personally participated in, or was an integral participant in, that force:

(a) Calderon, told of K.F.'s refusal, directed that a code be called instead of coming to speak with her; arrived only to repeat the directive; was present for the takedown and restraint; and directed the pat search after K.F.'s arm was injured.

(b) Lewis called the Code 2 without a preceding Code 1 and, with Williams, forced K.F.'s left arm behind her back, fracturing it. He heard the pop and did not stop the handcuffing of that arm.

(c) Williams, with Lewis, forced K.F.'s left arm behind her back, fracturing it. He heard the pop and did not alert staff until after she was handcuffed.

(d) Wilborn took K.F. to the floor with a rear leg sweep, held her right arm in a rear wrist lock, and handcuffed her, including the arm that had just popped.

(e) Slay held K.F.'s injured left arm in a rear wrist lock while she lay face down, held that arm as she was moved to sitting, and helped guide her to her room while she complained of pain.

(f) Dudziak held K.F.'s right arm in a rear wrist lock while Lewis and Williams forced her left arm behind her back.

(g) Aguila grabbed K.F.'s right arm as she was taken to the floor and held her left ankle while Lewis and Williams forced her left arm behind her back.

(h) Dargan held K.F.'s right leg during the restraint, held her injured left arm as K.F. reported pain of 10, escorted her to her room, and pat-searched her while she remained handcuffed.

(i) Leon held K.F.'s right arm as K.F. reported pain of 10, escorted her to her room while she complained of pain and had difficulty walking, and pat-searched her while she remained handcuffed.

66. Calderon is also liable as a supervisor. Told that K.F. was refusing the search and, on information and belief, that K.F. was asking for her, Calderon directed an emergency code rather than speak with K.F., then arrived only to repeat the directive. She knew or reasonably should have known that answering a malnourished, traumatized girl's refusal with a dozen officers would set in motion the force that followed. After the injury, she personally directed that the search proceed.

67. The force was objectively unreasonable in light of the safety need at each stage, K.F.'s age and size, her communicated distress, the vulnerabilities known to the particular defendant, the number of officers exercising control, and the absence of any attempt to strike, kick,

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

or flee. Once she was controlled and reported severe pain, the need to complete the pat-down did not justify continuing the same restraint without reassessment.

68. The unreasonable force applied to K.F.'s left arm caused the fracture. The continued restraint after signs of injury independently caused additional pain and psychological harm. Each defendant is liable for the injuries actually and proximately caused by that defendant's conduct.

69. Defendants acted with reckless or callous indifference to K.F.'s federally protected rights, warranting punitive damages.

**SECOND CLAIM FOR RELIEF**

**Failure to Intervene — Fourteenth Amendment (42 U.S.C. § 1983)**

**(Against Calderon, Lewis, Williams, Slay, Dargan, Leon, and Does 6–10)**

70. K.F. incorporates the Factual Allegations above.

71. As a youth in County custody, K.F. had a right under the Due Process Clause of the Fourteenth Amendment to be free from objectively unreasonable force. An officer who knows that another officer is using such force, and has a realistic opportunity to stop it, must take reasonable steps to do so.

72. Lewis and Williams each heard K.F.'s arm pop. Neither stopped Wilborn from handcuffing that arm behind her back or Slay from taking it in a rear wrist lock, and Williams did not alert staff to the sound until after she was cuffed.

73. Slay, Dargan, and Leon each heard K.F. complain of pain in her left arm, and Dargan and Leon heard her rate it a 10, before she was stood up, walked to her room, and searched. Calderon, who directed the search, was on the unit when Williams announced the pop and, on information and belief, heard K.F.'s complaints during the escort.

74. Each of these defendants had a realistic opportunity to call a pause: to leave K.F. seated, reposition or remove the cuffs, bring the nurse to her, or defer the pat search. Nothing about the escort or search was urgent, and K.F. was by then, in Dargan's words, "calm and cooperative."

75. None did. Each allowed the restraint, escort, and search to continue, in knowing or reckless disregard of K.F.'s right to be free from unreasonable force.

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

76. Those failures caused K.F. additional pain, distress, and psychological harm during the continued restraint.

**THIRD CLAIM FOR RELIEF**

**Municipal Liability (42 U.S.C. § 1983)**

**(Against the County)**

77. K.F. incorporates the Factual Allegations above and the allegations of the First and Second Claims for Relief.

78. The County's practices described above and its failure to train and supervise its officers in de-escalating, searching, and restraining youth with known trauma histories and medical fragility were the moving force behind the violations of K.F.'s Fourteenth Amendment rights alleged in the First and Second Claims for Relief.

79. Those deficiencies led officers to escalate a nonurgent search into a show of force and a prone restraint of a youth they knew to be fragile, and left them with no practice of pausing to reassess when signs of injury emerged. The County's preexisting failures to implement and enforce safeguards caused the injuries attributed to the underlying violations.

80. The County maintained those practices with deliberate indifference to the obvious risk that they would lead to unconstitutional force against vulnerable youth.

81. As a direct and proximate result, K.F. suffered the injuries and damages alleged above.

**FOURTH CLAIM FOR RELIEF**

**Disability Discrimination and Failure to Make Reasonable Modifications**

**Title II of the Americans with Disabilities Act (42 U.S.C. § 12132)**

**(Against the County)**

82. K.F. incorporates the Factual Allegations above.

83. The County is a public entity under 42 U.S.C. § 12131(1).

84. K.F. was a qualified individual with a disability under 42 U.S.C. § 12131(2), as described above. She has post-traumatic stress disorder, major depressive disorder, and an eating disorder. These impairments are episodic; when active, they substantially limit major life activities

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

including eating, sleeping, caring for herself, and interacting with others. 42 U.S.C. § 12102(2)(A), (4)(D). She also has a record of these impairments, documented by the County's own clinicians. With reasonable modifications, she was eligible to receive and participate in the custodial supervision, safety, search, housing, and behavioral-health services provided to youth in the facility.

85. The County had notice of K.F.'s disability-related needs through the pre-incident Probation contacts described above, her suicide-observation status, and the juvenile hall staff's direct interaction with her. At the scene, K.F. explicitly explained why touching caused acute distress and repeatedly requested to speak with Calderon. Those requests communicated the need for an individualized response, and that need was also apparent from the circumstances.

86. Reasonable modifications included arranging a calm conversation with a trusted adult or behavioral-health professional, reducing crowding, allowing time and physical space before a nonurgent pat-down, and assessing a less intrusive means of completing the immediate safety check while addressing the distress. Her PTSD limited her ability to tolerate being touched by staff without preparation and support. The modifications addressed that limitation directly, and none required forgoing the safety check altogether. The County failed to reasonably modify its routine search and response practices as required by 28 C.F.R. § 35.130(b)(7)(i).

87. The requested modifications were feasible before any asserted emergency and would not have fundamentally altered the County's custodial services or required abandonment of legitimate security measures. OYCR has since recommended that a routine, non-urgent search of a youth who does not want to be touched because of a history of sexual assault "be avoided when possible and, when necessary, conducted in a trauma-informed manner," and the County has begun developing such an approach. The County instead treated K.F.'s disability-related distress as a compliance problem requiring a show of force and hands-on restraint.

88. By reason of her disability and its failure to provide reasonable modifications, the County subjected K.F. to discriminatory treatment in the provision of its custodial services and caused her to suffer injury and loss of safe access to those services.

89. The County acted with deliberate indifference. Employees authorized to address the search interaction, including the responding supervisor, had notice of the substantial likelihood that

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

failing to adapt the response would violate K.F.'s rights and cause disability-related injury, yet failed to undertake an adequate individualized response. Their authority included pausing the interaction, changing the staff response, and obtaining appropriate assistance.

90. The denial of reasonable modifications was an actual and proximate cause of K.F.'s fracture, need for treatment, and other compensable losses. Under this claim she seeks compensatory relief authorized by Title II, including proven economic loss, future treatment costs, and any lost educational opportunities, and attorney's fees and costs under 42 U.S.C. § 12205.

**FIFTH CLAIM FOR RELIEF**

**Disability Discrimination and Failure to Make Reasonable Modifications**

**Section 504 of the Rehabilitation Act (29 U.S.C. § 794)**

**(Against the County)**

91. K.F. incorporates the Factual Allegations above and the allegations of the Fourth Claim for Relief.

92. On information and belief, the County's Probation Department receives federal financial assistance, and its juvenile detention operations are a program or activity under 29 U.S.C. § 794(b).

93. K.F. was otherwise qualified to participate in and receive the County's juvenile custodial services with the reasonable modifications described above. Solely by reason of her disability, she was denied reasonable modifications necessary for equal access and subjected to discriminatory treatment in those services.

94. The County had notice of K.F.'s disability-related need for modification and, with deliberate indifference, failed to provide an individualized response despite the available time and alternatives. That failure caused the injuries and compensable losses alleged here.

95. K.F. seeks compensatory relief authorized by section 504, including proven economic loss, future treatment costs, and any lost educational opportunities, and attorney's fees and costs under 29 U.S.C. § 794a(b).

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

**SIXTH CLAIM FOR RELIEF**

**Tom Bane Civil Rights Act (Cal. Civ. Code § 52.1)**

**(Against All Defendants)**

96. K.F. incorporates the Factual Allegations above.

97. Defendants interfered by threats, intimidation, or coercion with K.F.'s rights under the Fourteenth Amendment, article I, sections 7 and 13 of the California Constitution, and Civil Code section 43, including the rights to be free from objectively unreasonable custodial force and the right to bodily security, subject to lawful custodial restraints. Each defendant is liable for personally applying, knowingly directing, or knowingly assisting that interference.

98. The individual defendants acted with specific intent to interfere with those rights, including reckless disregard of them. Lewis and Williams forced K.F.'s arm behind her back and heard it pop; Slay, Dargan, and Leon continued holding, moving, and searching her after hearing her complaints of severe pain; Calderon directed the escalation and the search; and Wilborn, Aguila, and Dudziak took a 110-pound girl to the floor and pinned her limbs while her arm was forced behind her back. Each consciously disregarded K.F.'s right to bodily security. Their actual coercive force and knowing continuation of it supplied the threats, intimidation, or coercion.

99. The responsible County employees were peace officers or custodial officers within the meaning of California Civil Code section 52.1(n), acting within the scope of their employment. The County is liable for their actionable conduct under Government Code section 815.2 and Civil Code section 52.1. The immunities identified in section 52.1(n), including Government Code section 844.6, do not bar this Bane Act claim.

100. As a direct and proximate result of the defendants' actionable conduct, K.F. suffered the physical and emotional injuries alleged above. She seeks damages and all other remedies available under section 52.1, including applicable statutory relief and attorney's fees and costs.

**SEVENTH CLAIM FOR RELIEF**

**Battery (California Law and Government Code § 820)**

**(Against the Force Defendants and Does 1–5)**

101. K.F. incorporates the Factual Allegations above.

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

1. The Force Defendants and DOES 1 through 5 intentionally made harmful or offensive physical contact with K.F. by seizing, taking down, holding, handcuffing, and searching her. K.F. did not consent to that contact.

2. The contact exceeded what was reasonably necessary, including unreasonable arm manipulation and continued restraint after signs of injury, and therefore exceeded any privilege to use reasonable custodial force. The excessive contact caused the fracture or additional physical pain and psychological harm, according to each employee's conduct.

3. Under Government Code section 820, the responsible employees are personally liable for their tortious conduct to the extent provided by law. Defendants acted with malice and oppression, warranting punitive damages under Civil Code section 3294.

**EIGHTH CLAIM FOR RELIEF**

**Negligence (California Law and Government Code § 820)**

**(Against Calderon and the Force Defendants)**

4. K.F. incorporates the Factual Allegations above.

5. Each of these defendants had a custodial relationship with K.F. and owed her a duty of reasonable care, including in the tactical decisions that preceded their use of force. California Code of Regulations, title 15, section 1357(a)(1), Welfare and Institutions Code section 224.71(a)–(b), and the County's own policies inform that standard of care.

6. Each of these defendants breached that duty through his or her own conduct:

(a) Calderon, told that K.F. was refusing the search, directed an emergency code instead of speaking with her or summoning behavioral-health staff; brought approximately a dozen officers to a nonurgent search; and, after the warning about the pop and K.F.'s complaints of pain, directed that the search of the handcuffed, injured girl be completed.

(b) Lewis called a Code 2 without a preceding Code 1 roughly three minutes after K.F. sat down, then, with Williams, forced her left arm behind her back with enough force to fracture it, although he had observed that she appeared

malnourished, and after hearing it pop did not stop the handcuffing of that arm.

(c) Williams, with Lewis, forced K.F.'s left arm from above her head to behind her back with enough force to fracture it, and after hearing it pop did not alert staff until she was handcuffed.

(d) Wilborn answered K.F.'s statement that she had been touched her whole life with scripted disapproval and warnings of consequences, took her to the floor, and handcuffed behind her back the arm that had just popped.

(e) Aguila answered K.F.'s distress with scripted disapproval and the warning that refusal would bring a code, then took hold of her as she was taken to the floor and held her ankle.

(f) Dudziak held K.F.'s right arm in a rear elongated wrist lock while Lewis and Williams forced her left arm behind her back, adding force to a restraint that already had her controlled.

(g) Slay held K.F.'s injured left arm in a rear wrist lock and continued guiding her to her room after she complained of pain.

(h) Dargan and Leon, after hearing K.F. rate her pain a 10, stood her up, walked her to her room still handcuffed, and pat-searched her instead of stopping for a medical assessment.

7. None of them evaluated K.F.'s medical condition or trauma history when restraining her, as Policy 514 requires.

8. The negligence of Calderon, Lewis, Williams, Wilborn, Aguila, and Dudziak was an actual and proximate cause of the confrontation, the takedown, and the fracture. The negligence of Calderon, Lewis, Williams, Wilborn, Slay, Dargan, and Leon after the pop caused K.F. additional pain, distress, and psychological harm. Each is liable for the injury his or her own negligence caused.

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

LINOWITZ LAW
1300 CLAY STREET, SUITE 600, OAKLAND, CA 94612
PHONE: (510) 519-1401
EMAIL: ZACHARY@LINOWITZLAW.COM

## PRAYER FOR RELIEF

K.F. requests judgment against Defendants for:

1. Compensatory damages in an amount to be proven at trial;
2. Nominal damages on the constitutional claims where appropriate;
3. Punitive damages against the individual defendants;
4. Damages under Civil Code section 52.1(c), and civil penalties under section 52 against the individual defendants;
5. Attorneys' fees and costs under 42 U.S.C. §§ 1988 and 12205, 29 U.S.C. § 794a(b), Civil Code section 52.1, and Code of Civil Procedure section 1021.5;
6. Pre- and post-judgment interest as allowed by law; and
7. Such other relief as the Court finds just.

## DEMAND FOR JURY TRIAL

K.F. demands a jury trial on all issues so triable. Fed. R. Civ. P. 38(b); Civil L.R. 3-6.

Dated: November 6, 2026

Respectfully submitted,

LINOWITZ LAW



ZACHARY LINOWITZ
Attorney for Plaintiff K.F.